UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITIZENS INSURANCE COMPANY
OF AMERICA, as Subrogee of
Precision Aerospace Corporation,

       Plaintiff,

v.

MARUBENI CITIZEN-CINCOM, INC.,

       Defendant.
                                /

File No. 1:05-CV-476

HON. ROBERT HOLMES BELL

## **OPINION**

This negligence and breach of warranty action is before the Court on Defendant Marubeni Citizen-Cincom, Inc.'s motion for summary judgment. For the reasons that follow the motion will be granted.

### I.

Precision Aerospace Corporation operates a manufacturing facility at 704 Crofton, Grand Rapids, Michigan, where it manufactures parts used in the aerospace industry. In 2003 Precision Aerospace purchased an L20 Citizen-Cincom lathe ("the lathe") from Defendant Marubeni Citizen-Cincom, Inc. The lathe was installed at Precision Aerospace on December 30, 2003 by Keith Enger, an employee of Millennium Machinery.

On July 20, 2004, a lathe was left unattended while it was operating and caught on fire.

At the time of the fire Precision Aerospace was insured under a property insurance policy from Plaintiff Citizens Insurance Company of America. After paying Precision Aerospace a property damage claim of $230,478.39 pursuant to the policy, Plaintiff was subrogated to the rights of Precision Aerospace against Defendant. Subsequently, Plaintiff, standing in the shoes of Precision Aerospace, filed this action against Defendant for breach of warranty and negligence.

Mr. Michael Kroll of Safety Engineering Laboratories, Inc. was retained by Plaintiff to investigate the origin and cause of the fire. His report states in relevant part:

> The fire originated inside the lathe's cutting compartment. The fuel for this fire was Hangsterfer's Hard Cut 525 Light cutting oil being used inside the lathe. This oil based cutting oil has a flash point of 275ºF (Cleveland-open cup). The flash point for the oil based cutting oil was low enough to cause a fire hazard when used inside the lathe as a cutting oil/coolant for the machining of Waspaloy, a nickel based alloy.

(Kroll Rpt., Pl. Ex. G).

Plaintiff's second expert, Neil M. Canter, agreed that the cause of the fire was the use of a cutting oil with a flash point that was two low for the application:

> The cause of the fire is probably due to the wrong fluid (Hangsterfer's Hard Cut 525 Light) being used in the application. Hard Cut 525 Light is a non-combustible cutting oil at room temperature but the MSDS [Material Safety Data Sheet] does indicate that this product is combustible at elevated temperatures.
>
> The metal being machined is a high nickel alloy that is very difficult to machine. Nickel is not a good conductor of heat so in contrast to conventional steels, Waspaloy does not allow the heat generated during machining to dissipate as readily away from the cutting zone. . . .

2

> In my view, the heat buildup during the machining probably caused the fire. Heat produced during the machining raised the temperature to the point at which Hard Cut 525 Light could catch on fire.

(Canter Rpt, Pl. Ex. H).

Following the fire Precision Aerospace switched to using a synthetic cutting oil with a flash point greater than 410ºF and it has not experienced any more fires. (Kroll Rpt.; Canter Rpt.; Bui Dep. at 18-19).

Defendant has moved for summary based upon its contention that the undisputed facts reveal that the fire was caused not by any defect in the machine, but by Precision Aerospace's use of a cutting oil that had too low of a flashpoint for its particular application. Plaintiff opposes the motion for summary judgment based upon its contention that the oil was recommended and installed by Defendant and constituted an integral part of the machine supplied.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and

3

admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of America*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id. See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

Plaintiff's complaint alleges negligence and breach of warranty. Although negligence and breach of implied warranty may, in certain factual contexts, involve the same elements and proofs, the theories of negligence and implied warranty remain separate causes of action with different elements. *Bouverette v. Westinghouse Electric Corp.*, 245 Mich. App. 391, 395, 628 N.W.2d 86, 90 (2001). "A breach of warranty claim tests the fitness of the product and requires that the plaintiff 'prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains.'" *Kenkel v. Stanley Works*, 256 Mich. App. 548, 556-57, 665 N.W.2d 490, 496-97 (2003) (quoting *Piercefield v. Remington Arms Co.*, 375 Mich. 85, 98-99, 133 N.W.2d 129 (1965)). A

negligence claim, on the other hand, "tests the defendant's conduct instead of the product to determine whether it was reasonable under the circumstances." *Id.* (quoting *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 12, 538 N.W.2d 325 (1995)).

>Plaintiff's complaint alleges that Defendant was negligent in the following respects:
>
>a. Failing to manufacture and/or sell a product that was reasonably safe for its intended purpose and free from defects that could cause the damage;
>
>b. Manufacturing or selling a product that was not in conformance with industry standards;
>
>c. Failing to warn Precision Aerospace that the product was not properly manufactured and was subject to catching on fire;
>
>d. Failing to perform adequate tests and inspections of the product prior to its sale to ensure there was no hazards or hidden defects.

(Compl. ¶ 13). Plaintiff alleges that Defendant breached its express and implied warranties by supplying a lathe that was not fit and safe for its intended uses and purposes, that was not constructed in a workmanlike manner, and that contained numerous defects. (Compl. ¶ 18).

In response to Defendant's motion for summary judgment Plaintiff has not come forward with any evidence of negligence in the manufacture of the lathe or of any defects in the lathe itself. Instead, in light of its experts' opinions, Plaintiff now alleges that Defendant was negligent and breached its warranties by recommending and installing the wrong cutting oil.

Both Plaintiff's negligence claim and its breach of warranty claim are based upon Plaintiff's assumption that Defendant recommended and installed Hangsterfer's Hard Cut 525 LT cutting oil. There is no evidence, however, to support this allegation.

The undisputed evidence of record reflects that prior to installation of the lathe Defendant provided Precision Aerospace with an installation checklist which included recommended lubricants. Under the heading "CUTTING OIL" Defendant recommended:

> *HANGSTERFERS        HARDCUT ???LT
>
> (Hansgsterfers has many types of special oils and general purpose oils, please call Hangsterfers for the best type for your applications.)

(Installation Checklist, Pl. Ex. B). The associated footnote reiterates that Hangsterfer's cutting oil is recommended, and gives two contacts for finding the name of a local supplier. At the bottom of the list of recommended lubricants is the following notation:

> We hope that your completion of these pre-installation responsibilities will enable us to provide a proficient installation of our machine.

(Installation Checklist, Pl. Ex. B).

Mr. Enger installed the lathe. During the installation process Enger typically checked the voltage, checked the rotation, leveled the machine, aligned it, installed any options, and tested it. (Enger Dep. at 16). After the customer installed a program in the machine, Enger would run the machine. (Enger Dep. at 17). Enger does not need to know anything about the way the customer operates its business, or the types of product it is making in order to install the machine because there is a standard method of installing it. (Enger Dep. at 17).

When the machine arrives at the customer, it is empty. The machine lubricants are supplied by the customer. (Enger Dep. at 18). Enger does not make recommendations on coolants (Enger Dep. at 18). It is the customer's responsibility to have the oil ready to go in the machine when the installer arrives. (Enger Dep. at 34). The customer puts the oil in the machine. (Enger Dep. at 34). There are several different types of Hangsterfer's LT oils. (Enger Dep. at 35). The choice of what oil to use will depend in part on the type of alloy or metal that the lathe is cutting and on what gives the customer the best performance. (Enger Dep. at 36).

Installation of the L-20 lathe at Precision Aerospace followed these typical procedures. Precision Aerospace obtained the cutting oil before Enger arrived to install the lathe, and Precision Aerospace pumped the oil into the lathe after Enger leveled it. (Enger Dep. at 19-20). Mr. Enger does not recall giving any advice about oils when he installed the lathe at Precision Aerospace. He testified that he has never been involved in making a recommendation as to a coolant. (Enger Dep. at 18). Customers have asked him what he has used, and if anyone at Precision Aerospace had asked, he probably would have said Hangsterfers on a general basis because that is what Citizen has on its pre-install sheet. (Enger Dep. at 19).

Mr. Nghia Bui has been a machinist at Precision Aerospace for ten years. (Bui Dep. at 4).[1]  Mr. Bui is also the team leader. (Bui Dep. at 45). Mr. Bui never spoke to anyone at Defendant Citizen-Cincom about what type of oil should be used in the L-20 lathe. He relied instead on the recommendation in the pre-installation letter. (Bui Dep. at 20). Mr. Bui is not sure whether he spoke with Mr. Enger about the appropriate oil to use in the L-20 lathe. Although he thinks they did talk, he also observed that that is what everybody recommended. (Bui Dep. at 22).

Mr. Bui testified that they had been using a Citizen-Cincom L-32 lathe at Precision Aerospace for many years before purchasing the L-20 lathe that is the subject of this suit. Although they had originally been using Hangsterfer Hard Cut 531 on the L-32 lathe, seven or eight years ago he called either Hangsterfer or Brookdale, the distributor of a high-pressure pump they were using, because the Hard Cut 531 was too thick for the high-pressure pump. Precision Aerospace switched to Hangsterfer Hard Cut 525 light on the L-32 lathe at that time. Since switching to the Hard Cut 525 they did experience several fires on the L-32 lathe. (Bui Dep at 19-23).

Based upon the evidence of record it is clear that although Defendant recommended Hangsterfer's, a brand of cutting oil, Defendant did not recommend a specific oil. Defendant recommended Hangsterfer's "Hardcut ??? LT." There is no evidence that Defendant

---

[1] The transcript of the Bui deposition is improperly formatted and is extremely difficult to read. Although Plaintiff has not cited to any specific portions of that deposition, the Court has attempted to read and decipher the transcript to the best of its ability.

recommended that Precision Aerospace use Hangsterfer's Hard Cut 525 LT cutting oil. Instead, Defendant instructed Precision Aerospace in the Pre-Installation Checklist to discuss its applications with the oil supplier so that it could choose the best oil for its applications. The evidence is undisputed that Precision Aerospace was knowledgeable about the risk of fire. There is no evidence that Precision Aerospace discussed its specific applications with Defendant nor is there any evidence that Precision Aerospace relied on Defendant for selection of the specific type of Hangsterfer's oil to be used with Precision Aerospace's applications. Selection of the oil and installation of the oil were Precision Aerospace's responsibility.

Plaintiff has not come forward with sufficient evidence to create an issue of fact for a jury regarding either its negligence claim or its breach of warranty claim. Accordingly, the Court will enter summary judgment in favor of Defendant and dismiss this case in its entirety.

An order and judgment consistent with this opinion will be entered.


Date:   October 16, 2006             /s/ Robert Holmes Bell
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE